ORIGINAL  SEALED

FILED-USDC-NDTX-0A
'26 JUN 17 PM4:11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | NO.    3-26CR-310-K |
| v. | |
| MICHAEL MCMILLAN | **FILED UNDER SEAL** |

## INDICTMENT

The Grand Jury charges:

At all times material to the indictment:

### Introduction

1.      From in or around May 2019 through in or about at least February 2026, Defendant **Michael McMillan** engaged in a health care fraud scheme to illegally pay kickbacks to medical providers and fraudulently bill Medicare and other government healthcare benefit programs for claims related to skin substitute products.

2.      **McMillan**, through his various companies and with the aid of coconspirators, recruited physicians, podiatrists and other medical providers to use his companies' skin substitute products in exchange for illegal kickbacks and bribes.

3.      **McMillan** and others assisted the medical providers in billing Medicare and other government healthcare benefit programs for the skin substitute products at inflated rates with the understanding that once the government healthcare benefit programs paid the fraudulently submitted claims, **McMillan** would split the payments with the providers, resulting in an illegal kickback to the providers.

Indictment—Page 1

4.      Through this healthcare fraud scheme, **McMillan** paid approximately $94 million in kickbacks to medical providers and caused Medicare and other federal health care benefit programs to pay out approximately $268 million for these fraudulent claims.

## Parties

5.      Defendant **Michael McMillan** was a resident of Las Vegas, Nevada.

6.      Protectus LLC, Protectus Technologies LLC, Protectus Consulting LLC, Prestige Medical Consultants LLC, Velare Wound Care LLC, Amnio ReGen Solutions LLC (hereinafter referred to as "Protectus") were Nevada limited liability companies owned and controlled by **McMillan**.

7.      Medical Provider A was a physician and a resident of Arlington, Texas, located in the Northern District of Texas.

8.      Medical Provider B was a podiatrist and a resident of Santa Monica, California.

9.      Medical Provider C was a nurse practitioner and a resident of Dallas, Texas, located in the Northern District of Texas.

10.     Medical Provider D was a podiatrist and a resident of McKinney, Texas.

11.     Medical Provider E was a podiatrist and resident of Payson, Utah.

12.     Individual A was a resident of Trophy Club, Texas, located in the Northern District of Texas.

13.     Individual B was a resident of La Mirada, California.

14.     Individual C was a resident of Dallas, Texas, located in the Northern District of Texas.

Indictment—Page 2

15.     Individual D was a resident of Lehi, Utah.

<u>Government Healthcare Benefit Programs</u>

16.     The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age or over or disabled.  Medicare was administered by the Center of Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

17.     TRICARE was a healthcare program of the United States Department of Defense ("DoD") Military Health System that provided coverage for DoD beneficiaries worldwide, including active-duty services members, National Guard and Reserve Members, retirees, their families, and their survivors.  The Defense Health Agency ("DHA"), an agency of the DoD, was the governmental entity responsible for overseeing and administering the TRICARE program.

18.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the United States Department of Veteran Affairs ("VA").  CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries.  The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans of the United States military who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-related service-connected disability.

19.    Medicare, TRICARE, and CHAMPVA (collectively, the "government programs") were "health care benefit programs," as defined by 18 U.S.C. § 24(b), and "Federal health care programs," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

### Skin Substitutes

20.    The government healthcare benefit programs cover access to certain bioengineered products known as skin substitutes, also known as cellular or tissue-based products.  These include products known as allografts or wound grafts.  These skin substitutes are applied over open wounds to assist with wound closure or skin growth.

21.    The government programs reimburse providers for skin substitute products furnished to beneficiaries only if the skin substitutes were medically necessary.

22.    The government programs reimbursed for skin substitute products based on a price per square centimeter (sq cm).  Common sizes of skin substitute products include 2x4 sq cm, 4x4 sq cm, and 4x6 sq cm.

23.    The government programs would not pay claims for services that were procured by illegal kickbacks.

## Count One
### Conspiracy to Commit Health Care Fraud
(Violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347))

24.    All previous paragraphs of this indictment are realleged and incorporated by reference as though fully set forth herein.

25.    From in or around May 2019 through in or about at least February 2026, in the Northern District of Texas and elsewhere, defendant **Michael McMillan**, did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to commit the offense of health care fraud in violation of 18 U.S.C. § 1347, that is, to knowingly and willfully devise and execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), including Medicare, TRICARE, and CHAMPVA (hereinafter, the "government programs") and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of the "federal health care benefit programs," in connection with the delivery of and payment for health care items, benefits, and service, namely skin graft substitutes.

### Purpose of the Conspiracy

26.    It was the purpose of the conspiracy for **McMillan** and his coconspirators to unlawfully enrich themselves by causing the submission of fraudulent claims for skin substitutes that contained material misrepresentations and that were induced by kickbacks.

Manner and Means of the Conspiracy

27.    The manner and means by which **McMillan** and his coconspirators sought to accomplish the purpose of the conspiracy included, among other things:

28.    **McMillan**, through Protectus, offered various skin substitute products to medical providers, such as physicians and podiatrists, under an arrangement that guaranteed that medical providers profited thousands of dollars for every skin substitute claim the providers billed the government programs.

29.    Specifically, as part of the scheme, **McMillan** and Protectus offered skin substitutes to medical providers, including Medical Provider A, Medical Provider B, Medical Provider C, Medical Provider D, and Medical Provider E, located in the Northern District of Texas and elsewhere.

30.    Medical providers used these skin substitute products on their patients, many of whom were government program beneficiaries located in the Northern District of Texas and elsewhere.

31.    As part of the scheme, **McMillan** and Protectus provided skin substitute products to providers at no upfront cost. **McMillan** and Protectus agreed to only charge medical providers once they had received their reimbursement from the government programs for their claims for the products. If the government programs failed to reimburse for skin substitute products, **McMillan** did not charge the providers for the products.

32.    Additionally, **McMillan** and Protectus agreed to only charge a percentage—usually between 60% and 70%—of the reimbursement.

**Indictment—Page 6**

33.    Based on the arrangement, medical providers were guaranteed to receive—and did receive—an illegal kickback in the amount of 30% to 40% of the reimbursements from the government programs for every skin substitute claim for which the government program provided reimbursement.

34.    **McMillan** and his coconspirators knew that this arrangement resulted in an illegal kickback to medical providers.

35.    As part of the scheme, **McMillan** and employees of Protectus would either bill on behalf of the medical providers or assist the medical providers in billing the government programs for those products.

36.    In the claims to the government programs, medical providers were required to disclose the actual price, including all discounts, rebates, refunds, or other adjustments, that they had paid for the skin substitute products.  This information is disclosed in "Box 19" of Medicare claims.  **McMillan** and Protectus fraudulently submitted or counseled medical providers to fraudulently submit an inflated price that they knew was not the actual price of the skin substitute products to the medical providers.

37.    In total, **McMillan** and Protectus paid approximately $94 million in illegal kickbacks to medical providers.

38.    As part of the scheme, **McMillan** also paid illegal kickbacks to sales representatives, including Individual A, Individual B, Individual C, and Individual D, located in the Northern District of Texas and elsewhere, to improperly influence medical providers to use Protectus's skin substitute products.

39.     Specifically, **McMillan** hired sales representatives to recruit medical providers to the scheme.  Sales representatives, at the direction of **McMillan**, instructed medical providers as to the profit-sharing scheme and the resulting kickback that medical providers would receive for each skin substitute product they used.

40.     The sales representatives' compensation was directly tied to the reimbursements generated by medical providers that the representatives had recruited to the scheme.  Once medical providers were reimbursed for skin substitute claims and paid the 60% to 70% of the claims to Protectus, **McMillan** paid the representative a percentage of the money it received from the providers.

41.     **McMillan** and Protectus knew that these payments to sales representatives were illegal kickbacks and intended to induce medical referrals from the medical providers.

42.     In total, **McMillan** and Protectus paid approximately $27 million in illegal kickbacks to sales representatives.

43.     As a result of the scheme, **McMillan** and Protectus caused government programs to fraudulently pay out approximately $268 million for skin substitute claims. Of those funds, **McMillan** and Protectus received approximately $174 million.

44.     **McMillan** used the illegal proceeds of the scheme to fund a lavish lifestyle, which included the purchase of houses, condominiums, luxury vehicles, and a private jet.

All in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347).

Count Two
Conspiracy to Defraud the United States and to
Pay Kickbacks and Bribes in Connection with a
Federal Health Care Program
(Violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(2)))

45.     All preceding paragraphs of the Indictment are realleged and incorporated by reference as though fully set forth herein.

46.     From in or around May 2019 through in or about at least February 2026, in the Northern District of Texas and elsewhere, defendant **Michael McMillan** did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.      to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS in its administration and oversight of Medicare; and

b.      to violate 42 U.S.C. § 1320a-7b(b)(2)(B), by offering and paying remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in case and in kind, including by check and wire transfer, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program.

Object and Purpose of the Conspiracy

47.     It was the object and purpose of the conspiracy for **McMillan** and his coconspirators to unlawfully enrich themselves and others known and unknown to the

Indictment—Page 9

Grand Jury by, among other things: (a) submitting or causing the submission of false and fraudulent claims for skin substitute products to Medicare; (b) offering and paying kickbacks and bribes to medical providers, including Medical Provider A, Medical Provider B, Medical Provider C, Medical Provider D, and Medical Provider E, located in the Northern District of Texas and elsewhere, in exchange for medical providers to use Protectus's skin substitute products and fraudulently bill government programs; (c) offering and paying kickbacks and bribes to sales representatives, including Individual A, Individual B, Individual C, and Individual D, located in the Northern District of Texas and elsewhere, in exchange for them recruiting and referring medical providers to the scheme; (d) concealing the submission of false and fraudulent claims to Medicare; (e) concealing the payment of kickbacks and bribes to medical providers and sales representatives; and (f) diverting proceeds of the fraud for their personal use and benefit.

Manner and Means of the Conspiracy

48.     The manner and means by which **McMillan** and his coconspirators sought to accomplish the purpose of the conspiracy is set forth in Paragraphs 23 through 39.

Overt Acts

49.     In furtherance of the conspiracy, and to effect the objects of the conspiracy, **McMillan** and his coconspirators committed or caused to be committed various overt acts in the Northern District of Texas and elsewhere, including but not limited to the following:

50.     On or about October 31, 2022, a Protectus employee sent Medical Provider E Invoice No. 1902 via QuickBooks. The invoice included the following:

Total Collected $53,625.60

[Medical Provider E] Keeps $16,087.68

Due to Protectus Technologies LLC $37,537.92

51.     On or about November 4, 2022, an associate of Individual B emailed **McMillan**, copying Individual B, about discrepancies in Individual B's September commission report, for which they received $44,035.92 in kickbacks for skin substitute claims reimbursed to medical providers they had recruited. Among other issues, the email stated that the report was missing $6,446.55 in commissions based on the claim reimbursements their medical providers had received. On or about November 7, 2022, a Protectus employee emailed Individual B, copying **McMillan** stating, "We can only pay commission on payments that we are informed were paid by insurance from the office."

52.     On or about December 8, 2022, a Protectus employee emailed **McMillan** November 2022 commission reports, which documented kickbacks paid to sales representatives for that month. Per Individual D's commission report, Protectus paid Individual D $120,611.73. The commission report notes that Protectus paid Individual D an $8,446.03 kickback for the profits Medical Provider E generated for Protectus as documented in Invoice No. 1902.

53.     On or about July 31, 2023, Protectus LLC sent Invoice No. 2249 to Medical Provider A in the amount of $82,899.18. On or about the same day, an employee of Medical Provider A, located in the Northern District of Texas, forwarded the invoice to **McMillan** and stated: "[Medical Provider A] asked me to give you a message. He stated that according to new contract it should be a 40% profit and it shows 35% on this

attachment." On or about the same day, **McMillan** forwarded the email to an employee of Protectus and stated: "Please get this corrected."

54.    On or about August 7, 2023, Medical Provider A paid Protectus $76,522.32 via check. Those funds were transferred from a bank account located in the Northern District of Texas and controlled by Medical Provider A.

55.    On or about August 14, 2023, Individual A emailed Protectus asking "have we run comms yet for July?" On or about the same day, an employee of Protectus emailed Individual A: "Yes, they've been ran. [Medical Provider A] only had one invoice in July and it was not paid until August so it will show up on your next month's commission."

56.    On or about September 11, 2023, a Protectus employee emailed **McMillan** August 2023 commission reports for his approval, which included Individual A's commission report. The commission report noted that Protectus was going to pay Individual A $18,352.66, which was partly based on Invoice No. 2249 that Medical Provider A paid to Protectus on August 7, 2023. On or about September 18, 2023, Protectus issued a check to Individual A for $18,352.66. Those funds were deposited into a bank account located in the Northern District of Texas and controlled by Individual A.

57.    On or about December 7, 2023, Medical Provider B emailed several Protectus employees, including **McMillan**, and copying several individuals. The email included the following:

Some of the claims after 07/01/23 have been paid out under [ medical provider] and these funds are being returned to Medicare.

For two of these claims, I have already paid Protectus the due invoice. However, these two payments are being sent back to Medicare to be rebilled under my company. I have attached the 2 claims to this email.

I am requesting a refund to my credit card for the graft invoice as these payments are being returned to medicare. After the claims pay out again under my company, I can re-pay the invoice. For now, I am requesting a refund to the attached invoice so that I can return the money to Medicare.

58.    On or about December 11, 2023, **McMillan** responded: "Was out of the country flights delayed. We will handle today." On or about December 12, 2023, a Protectus employee responded with **McMillan** copied: "The refund was sent back through QuickBooks. You'll get an email notifying you of that refund. It may take a couple days to hit the card you used but it is on its way."

59.    On or about December 6, 2023, a Protectus employee texted Individual C: "FYI. [Medical Provider C] got paid $263,000 yesterday.  You are probably already aware".   On or about the same day, Individual C responded, "Yea, 6 days to [sic] late for commissions unfortunately".

60.    On or about December 11, 2023, a Protectus employee sent Medical Provider C Invoice No. 2451 via QuickBooks for $157,941.50.

61.    On or about January 12, 2024, a Protectus employee emailed **McMillan** Individual C's December 2023 commission report.  The commission report noted that Protectus was going to pay Individual C $66,6622.02, which was partly based on Invoice No. 2451 that Medical Provider C paid to Protectus.

Indictment—Page 13

62. On or about January 15, 2024, Protectus paid Individual C $66,6622.02.

63. On or about March 27, 2024, **McMillan** met with Medical Provider D and another individual. In the meeting, **McMillan** explained to Medical Provider D that Protectus offered an average rebate of 35% to medical providers for its skin substitute products. **McMillan** further explained that if Medical Provider D billed and collected from Medicare $180,000 a month for skin substitute claims, Medical Provider D would make 35% or $63,000 for those claims.

64. In the March 27, 2024 meeting, **McMillan** further explained that he reviewed every single claim to Medicare to make sure that his skin substitute products were billed at a higher price than what medical providers were actually paying.

65. In or about March or April 2024, Protectus provided Medical Provider D 12 skin substitute products at no upfront cost.

66. On or about May 16, 2024, Medical Provider D emailed a Protectus employee that Medicare had reimbursed him for one claim and denied one claim. In or about May 17, 2024, the Protectus employee responded to Medical Provider D: "For the paid claim once we have the payment information you will be invoiced via Quickbooks the following Monday. For the denied claim we will be able to assist getting resolved once we have the denial and know the reason." On or about May 17, 2024, Medical Provider D emailed the Protectus employee an Explanation of Benefits stating that Medicare paid $9,024 for one of the skin substitute claims and an Explanation of Benefits stating that Medicare denied the other skin substitute claim.

67.     On or about May 17, 2024, the Protectus employee emailed Medical Provider D: "It appears from the EOB for [patient name], box 19 was not included on the claim. The claim needs to be resubmitted with box 19, the information needed to be on the claim is on the spreadsheet."

68.     On or about May 20, 2024, a Protectus employee sent Medical Provider D Invoice No. 2817 via QuickBooks for $5,865.60, which is 65% of the amount that Medical Provider D reported to Protectus that he was paid.

All in violation of 18 U.S.C. § 371.

Counts Three through Nine
Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity
(Violation of 18 U.S.C. § 1957)

69.    All preceding paragraphs of the Indictment are realleged and incorporated by reference as though fully set forth herein.

70.    On or about the approximate dates listed below, defendant Michael **McMillan**, individually and doing business under the entities described above, along with other individuals and entities known and unknown to the grand jury, in the Northern District of Texas and elsewhere, knowingly engaged and attempted to engage in the following transactions in the United States with criminally derived property of value exceeding $10,000, derived from specified unlawful activity, namely conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and conspiracy to defraud the United States and to pay kickbacks and bribes in connection with a federal health care program, in violation of 18 U.S.C. § 371:

| Count | Approximate Date | Originating Account | Description of Property Purchased | Approximate Amount |
|---|---|---|---|---|
| 3 | 12/01/2021 | Michael McMillan x1003 | 2200 Victory Avenue, Unit 2204, Dallas, TX 75219 | $1,010,166.02 |
| 4 | 07/19/2023 | Protectus LLC x0120 | 2023 Lamborghini Urus Performance VINZPBUC3ZL6PLA24618 | $60,000.00 |
| 5 | 09/01/2023 | Protectus LLC x0120 | 9 Oakmont Hills Lane, Las Vegas, NV 89141 | $260,466.02 |
| 6 | 05/21/2024 | Michael McMillan x9992 | 1058 Majestic Oaks Way, Simpsonville, KY 40067 | $1,300,000.00 |
| 7 | 10/30/2024 | Protectus LLC x9683 | 117 6th Street, Del Mar, CA 92014 | $1,041,625.00 |

Indictment—Page 16

| 8 | 03/13/2025 | Protectus LLC x9683 | 2023 Cadillac TR Escalade V-S VIN 1GYS4HK90PR243900 | $50,000.00 |
| 9 | 09/16/2025 | Elite Elevated Enterprises LLC x2286 | 1997 Cessna Citation VII | $2,557,325.00 |

Each in violation of 18 U.S.C. § 1957.

Indictment—Page 17

Notice of Forfeiture
(18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); 18 U.S.C § 982(a)(7); 18 U.S.C. § 982(a)(1))

71.     The allegations contained in the preceding paragraphs of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); 18 U.S.C § 982(a)(7); and 18 U.S.C. § 982(a)(1).

72.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of the offense alleged in Count One, defendant **Michael McMillan** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the offense.

73.     Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of the offense alleged in Count Two, defendant **Michael McMillan** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

74.     Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any of the offenses alleged in Counts Three through Nine, defendant **Michael McMillan** shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property.

75.     The property to be forfeited includes, but is not limited to, a "money judgment" in the amount of U.S. currency constituting the gross proceeds traceable to the offense.

Indictment—Page 18

76.     The property subject to forfeiture includes, but is not limited to, the following:

a. real property located at 1058 Majestic Oaks Way, Simpsonville, KY 40067-6670, USA;

b. real property located at 2200 Victory Ave Apt 2204, Dallas, TX 75219, USA;

c. real property located at 117 6th Street, Del Mar, CA 92014-2708, USA;

d. real property located at 9 Oakmont Hills Lane, Las Vegas, NV 89141-6087, USA; and

e. real property located at 2000 Fashion Show Drive #4708, Las Vegas, NV 89109-1615, USA

77.     Pursuant to 21 U.S.C. § 853(p), if any of the property described above, as a result of any act or omission of the defendant;

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL

_____
FOREPERSON

RYAN RAYBOULD
UNITED STATES ATTORNEY

_____
MARTY BASU
Assistant United States Attorney
Illinois State Bar No. 6302360
CHAD E. MEACHAM
Assistant United States Attorney
Texas State Bar No. 00784584
1100 Commerce Street, Suite 300
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Fax:  214-659-8812
Email: marty.basu@usdoj.gov
Email: chad.meacham@usdoj.gov

Indictment—Page 20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

MICHAEL MCMILLAN

SEALED INDICTMENT

18 U.S.C. § 1349 (18 U.S.C. § 1347)
Conspiracy to Commit Health Care Fraud
(Count 1)

18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(2))
Conspiracy to Defraud the United States and to
Pay Kickbacks and Bribes in Connection with a
Federal Health Care Program
(Count 2)

18 U.S.C. § 1957
Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity
(Counts 3-9)

18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); 18 U.S.C § 982(a)(7); 18 U.S.C. §
982(a)(1)
Notice of Forfeiture

9 Counts

A true bill rendered

--------------------------------------------------------------------------------   _____
                                                                                    FOREPERSON
DALLAS

Filed in open court this __17__ day of June, 2026.

----------------------------------------------------------------------------------------------------

**Warrant to be Issued**

----------------------------------------------------------------------------------------------------

_____
UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending